## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

**VDARE FOUNDATION, INC.**

**Plaintiff,**

                                      **Civil Case No. 25-cv-810-MAD-ML**

**v.**

**LETITIA JAMES, JAMES SHEEHAN,**
**RICHARD SAWYER, MEGHAN FAUX,**
**EMILY STERN, RACHEL FINN,**
**BENJAMIN D. LIEBOWITZ, and**
**YAEL FUCHS,**
**in their individual and/or official capacities,**
**Defendants.**

### VDARE FOUNDATION, INC.'S AMENDED COMPLAINT

Plaintiff VDARE Foundation, Inc. ("VDARE") files this Amended Complaint against Defendants New York State Attorney General Letitia James and Assistant Attorney Generals James Sheehan, Richard Sawyer, Meghan Faux, Emily Stern, Rachel Finn, Benjamin D. Liebowitz, and Yael Fuchs in their individual and/or official capacities, alleging as follows:

### PRELIMINARY STATEMENT

This action seeks redress for First Amendment Retaliatory harassment and Equal Protection violations by Defendants; it also seeks declaratory and injunctive relief. Defendants James, Sheehan, Sawyer, Faux, Stern, Finn, Liebowitz, and Fuchs are state actors who burden speech they hate by the willful abuse of regulatory authority and bad faith exploitation of state court presumptions. As set forth in this complaint VDARE engages in political speech at the very heart of First Amendment protection: it criticizes government policy that appears to demonstrate incompetence and even outright dishonesty. James and the several attorneys in her office seek to

1

crush this criticism through the abuse of state power.  The action seeks redress for an abusive subpoena, a bad faith civil complaint, and declaratory and injunctive relief.

## PARTIES

1. Plaintiff VDARE is a non-profit 501c3 educational organization organized and existing under the laws of the State of New York, but with a principal place of business at 276 Cacapon Road, Berkely Springs, West Virginia.

2. Defendant James is the Attorney General of the State of New York who was sworn into office on January 1, 2019.  Her principal place of business is The Capitol, Albany, New York.  She is sued here in her individual and official capacities.

3. James was at all times relevant to this complaint the New York Attorney General and has final policymaking authority with respect to her office and is responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the attorneys under her command, including all other Defendants herein.  She has personally supervised the abusive litigation herein and was copied on and discussed a letter from VDARE's counsel dated August 1, 2023 which alerted her to her office's abuse.

4. James Sheehan is and was an assistant attorney general in James' office.  He is now the Charities Bureau Chief within said office.  He is sued here in his individual and official capacities.

5. Meghan Faux is and was an assistant attorney general in James' office.  She is now the Chief Deputy Charities Attorney General for Social Justice within said office.  She is sued here in her individual and official capacities.

6. Emily Stern is and was an assistant attorney general in James' office. She is now the Sections Chief, Charities Bureau within said office. She is sued here in her individual and official capacities.

7. Richard "Rick" Sawyer is and was an assistant attorney general in James' office who has been designated as "Special Counsel for Hate Crimes" and "Hate Crimes and Bias Prevention Section Chief." He is sued here in his official and individual capacities.

8. Rachel Finn is and was an assistant attorney general in James' office who also works with Rick Sawyer in his capacity as "Hate Crimes and Bias Prevention Section Chief." She is sued here in her individual and official capacities.

9. Benjamin D. Liebowitz is and was an assistant attorney general in James' office. He is sued here in his individual and official capacities.

10. Yael Fuchs was formerly an assistant attorney general in James' office and acted here as the Co-Chief, Enforcement Section of the Charities Division in the James's office and worked in conjunction with Defendant Sawyer. She has since departed the AG's office, but is sued here in her individual capacity

11. Moreover, all Defendants were clothed with authority from the state and acted under color of law and were state actors.

12. Nevertheless, as state actors operating under color of law, Defendants came into conflict with the superior authority of the Constitution, the First and Fourteenth Amendments, and were therefore stripped of their official or representative character and are rightly subjected in their persons to the consequences of their lawless conduct.

**JURISDICTION AND VENUE**

13. Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution, and because this action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution. Subject matter jurisdiction is also conferred by 28 U.S.C. §§ 2201-2202, authorizing declaratory relief.

14. Venue is proper in this district under 28 U.S.C. § 1391(b) as Defendant James has her principal office within it.

15. There is a present and actual controversy between the parties.

16. The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-2202 (declaratory relief), 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), 42 U.S.C. § 1985(3) (conspiracy against rights), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

**FACTS COMMON TO ALL ACTIONS**

**I.**
**JAMES'S OFFICE HARASSES VDARE WITH SUBPOENAS, THEN PUBLICLY BOASTS THAT IT CAN ABUSE SUBPOENA POWER TO CRUSH PROTECTED SPEECH.**

17. In the summer of 2022, VDARE was administratively harassed with an intentionally abusive investigation by James's office.

18. Indeed, VDARE was the focus of no less than three subpoenas:

4

    a.   The New York Attorney General Subpoena to Meta Platforms, Inc. dated May 13, 2022, hereafter the "Meta Subpoena";

    b.   The New York Attorney General Subpoena to Facebook Payments, Inc. dated June 14, 2022, hereafter the "Facebook Subpoena";

    c.   The New York Attorney General Subpoena to VDARE Foundation, Inc. dated June 23, 2022, hereafter the "Charities Subpoena" — attached hereto as *Exhibit 1*.

19. All told, the three subpoenas sought a staggering amount of documentation across almost seventy categories, with some demands seeking material from 1999 onwards and necessitating email accounts searches of millions of pages of data.

20. None of these demands were appropriately tailored to the alleged suspicions that James's office stated gave rise to their investigation; they were instead motivated solely by the unlawful desire to suppress VDARE's speech.

21. Moreover, when the attorneys in James's office went before the New York state court on December 16, 2022, they deliberately or recklessly misstated facts and legal conclusions at pages 6-7 and 16 of Record Entry 3 of New York Supreme Court Index No. 453196/2022 which sought enforcement of the Charities Subpoena.  Further details are set forth below.

22. Defendant Rick Sawyer, then designated as the "Special Counsel for Hate Crimes," signed both the Meta Subpoena and the Facebook Subpoena.

23. But Defendant Rick Sawyer has also played a central part in the investigation and enforcement of the Charities Subpoena, one that he continues to play even now.

24. Defendant Rick Sawyer's role in the harassment of VDARE is crucial because on or about November 10, 2022, this very same Rick Sawyer appeared on a panel discussion (entitled, "Securing Our Democracy: Taking Hate and Extremism to Court," hereafter referred to

simply "Taking Hate to Court") hosted by the Anti-Defamation League (ADL) in New York City, where he essentially stated that Letitia James's office had discovered it could abuse subpoena power to crush speech at the core of the First Amendment.

25. The full panel discussion for "Taking Hate to Court" is available on You Tube at:

https://www.youtube.com/watch?app=desktop&v=ltWCcQ8nNNk

 (Accessed June 18, 2025).

26. What Defendant Sawyer erroneously refers to as "hate" in "Taking Hate to Court" is something that he knows full well merits protection under the First Amendment.

27. Thus, Mr. Sawyer would reluctantly acknowledge in his remarks that, "Hate is protected in the United States Constitution.  The First Amendment protects hate, hateful speech, hateful thoughts." *Taking Hate to Court circa 31:25.*

28. Of course, this pre-occupation in James's office with protected speech points to something seriously disordered within the workings of the New York Attorney General's office.

29. Under our democracy we do not, in fact, combat protected speech by "taking it to court."

30. Rather, under our democracy it is the traditional right "of Americans to discuss and evaluate ideas without fear of governmental sanction" (*Dennis v. United States*, 341 U.S. 494, 502 (1951)) because "the basis of the First Amendment is the hypothesis that speech can rebut speech, propaganda will answer propaganda, free debate of ideas will result in the wisest governmental policies."

31. But Defendant Sawyer and the other Defendants think otherwise.

32. *Circa 28:13* of *Taking Hate to Court*, the ADL Moderator asks, "What about the idea of deterrence?  Can lawsuits like Tanya's deter bad actors in the future or not?"

33. It is in response to this question that Mr. Sawyer acknowledged that the "hate" that he and the ADL want to take to court is in fact protected by the Constitution and the First Amendment, as referenced above. *Id. circa 31:19-31:28.*

34. However, Defendant Sawyer then elaborates on the ways in which litigation can be abused to chill protected speech:

> "What this... what these kinds of lawsuits help do is show you the lines that you have to color in [*Sawyer gesturing like a child to show coloring within the lines*] if you want to be doing these kinds of dog whistles and that itself, I think, is... I mean I think you [*referring to co-panelist*] put it probably better than I'm about to. But that itself is an accomplishment where you say... you're corralling [*again the infantile gesture*] what people are allowed to do and what people... think that they're allowed to do.

> "There's also the question of specific deterrence. The deterrence against the individuals who are actually being sued because, you know even if... even if it... you don't end up with a 14 million dollar judgment <u>at the end of the day the lawyers in the room know that it sucks to get sued</u>. And not for the lawyers, but for their clients...

> "<u>It's massively expensive.</u>

> "<u>It opens your whole life up to discovery</u>.

> "<u>It can ruin your credit</u>.

> "<u>It can ruin, you know, your opportunity to do a lot of things that you would otherwise be doing with your time when you have to respond to discovery requests, get ready for depositions, testify, etc</u>.

> "So you know <u>putting people through the ringer like that really makes them think twice about acting out in the public sphere</u>."

> *Id. circa 31:30–32:44.*

35. Discovery abuse has long been identified as one of the defects of litigation.

36. Yet as the above makes clear, what Defendant Sawyer and the New York Attorney General's Office have decided upon is discovery abuse in litigation as a means to chill protected speech.

7

37. Indeed, Defendant Sawyer sees silencing people's free speech rights as a direct benefit of litigation, rather than a collateral evil to be avoided.

38. Thus, Defendant Sawyer had this to say about a lawsuit fellow panelist Tanya Gersh brought against a writer named Andrew Anglin (who apparently crossed the line into incitement and harassment): "But Andrew Anglin can't pay a $14M judgment. But Tanya owns Daily Stormer now. I mean that's something [Sawyer laughing]. He can't publish his own website anymore. <u>So, you know, that's effective</u>." *Id. circa. 24:50–26:35*.

39. Defendant Sawyer was fairly explicit that the abuses he had outlined would be accomplished through subpoena power over charities and intentionally burdensome litigation – which is exactly the abuse that VDARE was subjected to.

40. Thus in response to a question as to what the unique strength the state attorney generals had when attempting to "take hate to court," Defendant Sawyer immediately answered "subpoena authority against charities", to wit:

> "Attorney general's offices have <u>a massive amount of power within their jurisdiction</u>... <u>We have subpoena authority against charities</u>.

> "We have subpoena authority against any business that's engaged in business in the state of New York. <u>And this is all even before we even file a lawsuit by the way for people who are lawyers. So we get you know we can get massive amounts of discovery without even having to go to court</u>.

> "And so you know that's [*sic*] part of our unique roles <u>we have the opportunity to do massive investigations, look into organizations that are you know sham charities, that are that are advancing you know hate speech</u> [*that is to say, advancing speech Defendant Sawyer concedes is perfectly legal, but that <u>he </u>hates*].

> "We can look into groups that are making money off of hate.

> "And we can look it into individuals who've committed acts of hate crimes without even going to court.

"We can enter into creative settlements like we were discussing earlier today before even filing a lawsuit.

"So you know Attorney General's office is, are, [sic] I would say, are an untapped resource in this in this area.  A lot of us a lot of our offices are waking up to the power we have and a lot of us....

"I mean I've been working with attorney general's offices across the country to kind of develop capacity in this area and it's something where you as voters and constituents can keep pushing forward. I also say that there's opportunity for collaboration across plain private law."

*Id*. circa 51:22–53:03.

41. Defendant Sawyer was not speaking merely about deterring prohibited conduct; he indicates that he is reaching directly for protected speech – and doing so intentionally.

42.  For one thing even in the above passage, Defendant Sawyer distinguishes between those "advancing hate speech," those "making money off of hate," and those "individuals who've committed acts of hate crimes."

43. But even earlier Defendant Sawyer had boasted that his "creative" abuse of the law was actually a clever means of silencing dissident speech:

"You know the other thing is, we don't think about [sic]... there's a big disconnect between the people on the street doing the hate crime... the people on the subway who are targeting Asian people... the people who are scribbling swastikas on synagogues.. And the people out in the world fomenting the hate.  The people like Andrew Anglin usually don't have the courage to go out and commit the crimes.

"So by targeting these groups in creative ways, by targeting groups that are fomenting hate, but also violating the law while they're doing it you're taking the megaphone away from the people who are inspiring the street level kinds of crime that do get prosecuted and you're taking much bigger bite out of the apple."

*Id. circa 25:44–26:30.*

44.  Defendant Sawyer speaks falsely when he asserts that "we don't think about" the "big disconnect" between crime and protected speech.  To the contrary, wrestling with the mere tendency of speech, good or bad, has been a central feature in the development of modern First Amendment jurisprudence.

45. From the very dawn of modern First Amendment jurisprudence the "bad tendency test" has been rigorously considered by scholars and jurists, from Zechariah Chafee's "Free Speech in War Time"[1] down to modern Supreme Court opinions such as *Counterman v. Colorado*, 143 S.Ct. 2106, 2118 (2023), *viz.* "...incitement to disorder is commonly a hair's breadth away from political 'advocacy'– and particularly from strong protests against the government and prevailing social order."

46. The modern understanding is concisely stated in *Regan v. Taxation With Representation*, 461 U.S. 540, 548 (1983): we simply do not countenance censorship aimed "'at the suppression of dangerous ideas.'"

47. Defendant Sawyer's "creative way" to get at speech that he thinks has a bad tendency is nothing more nor less than the deliberate and intentional rejection of nearly a century of binding precedent of which Defendant Sawyer and all other Defendants are fully aware.

48. Defendant Sawyer's dishonest and uncreative ploy is to exploit the presumption of good faith that he knows his office is usually accorded by state courts (*i.e.* the "Attorney general's offices have a massive amount of power within their jurisdiction... We have subpoena authority against charities…") by abusing subpoena power and inflicting needless litigation to burden publishers of protected speech.

---

[1] 32 HARV L. REV. 932 (1918-1919), i.e. "The real issue in every free-speech controversy is this – whether the state can punish all words which have some tendency, however remote, to bring about acts in violation of law, or only words which directly incite to acts in violation of law." Id. at 948.

49. Nor is Defendant Sawyer alone culpable; hence his reference to "working with attorney general's offices across the country to kind of develop capacity in this area," which is activity that would and did draw the attention of others within the New York Attorney General's Office, including all Defendants herein.

50. Defendants – all of them – have thus intentionally rejected the "strategic protection" for speech the courts have built up over decades by rejecting the alleged "bad tendency test" of speech and are apparently attempting to spread this malign practice beyond state lines.

51. Defendant Sawyer, along with all other Defendants, unfairly and erroneously considers VDARE to be a purveyor of "hate speech." They share this hostility to VDARE's speech along with ideological allies like the ADL.

52. Yet "hate speech" is an imprecise, phony, pseudo-category that is not recognized in the jurisprudence of the First Amendment.

53. It appears at first to be kin to the "fighting words" category of speech that has been largely abandoned, but upon closer examination it often means only speech that government actors hate because such speech is rational criticism of government policy – which is how Defendants deploy it against VDARE.

54. Nevertheless, all Defendants know that VDARE is tarred with pejoratives like "hate speech" and share the ideological outlook of organizations such as the ADL, which has long labeled VDARE as a purveyor of hate speech.

55. In fact, Sawyer's host for "Taking Hate to Court," the ADL, had released a report in June of 2021 entitled "Extremist and Hate Groups May be Abusing Non-Profit Status" which specifically featured VDARE. "Extremist and Hate Groups May be Abusing Non-Profit Status"— *Exhibit 2 attached hereto, at pp. 7-9.*

56. Upon information and belief, the ADL shared this same June 2021 report with James's office and Defendant Sawyer and all other Defendants had reviewed said report.

57. Moreover, James and her office have a demonstrated history of targeting citizens who speak of the Great Replacement.

58. Thus, in a letter addressed to General Michael Flynn and Clay Clark dated August 3, 2022 (the "August 3rd Letter"), James again underscored her disregard of free speech for the thought she hates.

59. In the August 3rd Letter, James, took issue with alleged "white nationalist ideals connected to the 'Great Replacement Theory,'" which James derided as a "conspiracy theory" which she maintains is linked to violence.

60. Furthermore, when Defendant Sawyer began his panel discussion at Taking Hate to Court he drew comparisons between the post-Civil War Ku Klux Klan and those who speak of the Great Replacement today. *Taking Hate to Court: 6:40–7:26, 8:57–9:20*.

61. But the Great Replacement and the demographic changes that have occurred in this nation since the Hart-Celler 1965 Immigration & Nationality Act can be rightly described as the central focus of VDARE's publishing effort.

62. Indeed, when Defendant Sawyer indicated that state actors could use subpoena power against charities to target protected speech at Taking Hate to Court, he had VDARE in mind because even then his office was engaged in abusing VDARE, a registered charity in New York, over protected speech.

63. Defendants James, Sheehan, Faux, Stern, Sawyer, Finn, and Liebowitz continued on the same lawless policy outlined by Defendant Sawyer at *Taking Hate to Court* by the filing of a Civil Complaint in New York Supreme Court, County of New York, Index No.

452397/2025 on September 3, 2025. *Civil Complaint dated September 3, 2025 — Exhibit 3 attached hereto*

64. The said "Civil Complaint" is noteworthy, amongst other things, in that its biggest alleged violations are the so-called "Castle Transactions," which Defendants insist were unlawful related party transactions – and yet Defendants fail to identify any "director, officer or key person who has an interest" in the Castle Transactions. *cf. NPCL §715(a).*

65. That is because there were none – VDARE insiders were not enriching themselves in the Castle Transactions. VDARE has been sued anyway – because the process is the punishment, and punishment for speech is the Defendants's purpose.

66. Thus, for the biggest alleged violation Defendants have raised in the Civil Complaint, Defendants have no reasonable expectation of obtaining a favorable outcome because they cannot even plead a violation of *NPCL §715(a).*

67. Defendants James, Sheehan, Faux, Stern, Sawyer, Finn, Fuchs, and Liebowitz, all harbored ill will toward Plaintiffs owing solely to the content and viewpoint of the speech revealed on VDARE's website, and would not have worked to serve subpoenas, nor filed the Civil Complaint absent that ill will.

68. Furthermore, Defendants James, Sheehan, Faux, Stern, Sawyer, Finn, Fuchs, and Liebowitz, retaliated against Plaintiffs owing to a policy of abusing state power to suppress speech that is protected by the First Amendment, as shown by the large number of Defendants working together from within the Attorney General's office.

69. This lawless policy was premeditated and formed months and even years before the unlawful subpoenas of 2022, as demonstrated by Defendant Sawyer's remarks at the ADL conference in November of 2022 and the ADL Report of 2021.

70. This lawless policy was likewise premeditated and formed months and even years before filing of the Civil Complaint on September 3, 2025, as demonstrated by Defendant Sawyer's remarks at the ADL conference in November of 2022 and the ADL Report of 2021.

71. There is objective evidence of the lawless policy, as shown by both Defendant Sawyer's remarks at the ADL conference in November of 2022 and the sheer incongruity of the charges lodged against VDARE when other charities which present much worse circumstances – including but not limited to Bushwick Development Corp. and CORE Services Group Inc. – suffer no investigation or action by the AG's office whatsoever.

72. Both Bushwick Development Corp. ("Bushwick") and CORE Services Group Inc. ("CORE") came to the specific attention of the AG's office no later than 2022 (if not years earlier), as revealed by an Affirmation dated February 1, 2024 by Assistant Attorney General Linda Rosen Heinberg, of James's Charities Bureau, filed in a New York State court case captioned "*In the Matter of the Application of Bushwick Economic Develop Corp, Kings County Supreme Index No. 537435/2023.*"

73. During the time that Assistant Attorney General Linda Rosen Heinberg worked in the Charities Bureau she would have answered to Defendants Fuchs and Sheehan, as well as Defendant James.

74. The facts that came to Defendants's attention regarding Bushwick were particularly horrifying and included including admissions under oath that demonstrated:

   a. The burning death of two infants due to corruption and negligence at Bushwick;

   b. unlawful and unreasonable executive compensation over multiple years;

    c.   unlawful related party transactions that horrifically damaged the beneficiaries of a New York non–profit;

    d.   the wholesale omission of annual filings;

    e.   false and misleading statements on the one annual filing that was made; and

    f.   rampant violations over several years involving unlawful governmental grants in violation of EPTL § 8-1.4

75. During the same time the AG's office was mercilessly hunting VDARE over technical infractions, James and her fellow Defendants took no action against Bushwick or the shameless grifters running it: no volley of subpoenas, no enforcement action for an accounting or restitution, no attempt to unwind transactions, nothing.

76. That is because New York's charity laws and regulations, as deployed by James's office, are not actually used to police charities, not even when two infants are burned alive; they are instead sticks with which to bludgeon ideological opponents and suppress free speech rights.

77. Kill two children and James and her fellow Defendants are simply not interested – but just try and discuss taboo topics, and, spurred on by the ADL, the Letitia James and the Emily Sterns and Yael Fuchs and Rick Sawyers in the AG's office are poring over the statute books to see if they can discern a technical infraction.

78. Likewise with regard to CORE, which presents documented cases of rampant charity violations involving tens of millions of dollars in related party transactions for several years during James' tenure as Attorney General, unreported and excessive executive compensation in the millions of dollars, an unfiled audit flagging the excessive

compensation, false or misleading filings, mischeduled loans to related parties, and other ills.

79. To take but one example of CORE's obvious corruption – an example which by no means exhausts the flagrant abuses staring Defendants in the face in light of AAG Heinberg's Affirmation dated February 1, 2024 – CORE filed a third/amended annual filing with the AG's office dated April 2, 2020 (but for tax year 2018) showing:

    a. The curious omission of hundreds of thousands of dollars of executive compensation for CORE CEO Jack Brown;

    b. Over Ten Million Dollars in related party transactions with the entities CORE Facilities Management, LLC, Flavor Foods, LLC, PROCORE, LLC, which were listed as CORE's highest paid independent contractors that year;

    c. The failure to list anything in terms of "Excess Benefit Transactions" on Part I of Schedule L;

    d. Over Fourteen Million Dollars which had gone missing from the amounts shared with a related organization identified as "CORE Companies, inc.," which had previously been identified on other filings for said tax year;

    e. Over One Million Dollars (viz. $1,304,191) in "loans to or from" a related organization.

    f. That merely cross referencing pages 12 and 56 of the said *Third 2018 Annual Filing* would have revealed that CORE was engaged in over $10M in related party transactions: its largest "independent contractors" were also very large unlawful related party transactions as the AG pretends to understand such transactions where VDARE is concerned.

80.  Thus, from that filing alone, the very real probability of *unlawful* related party transactions should have raised hackles in the AG's Charities Bureau because the "performance of services" is not self-executing: When a charity sends tens of millions of dollars through an affiliate for the performance of services, there is the distinct possibility that an insider might step in to take a cut, which appears to have been the case at CORE.

81. But as with Bushwick, James and her fellow Defendants took no action against CORE or the shameless grifters running it: no volley of subpoenas, no enforcement action for an accounting or restitution, no attempt to unwind transactions, nothing.

82. There is little or no doubt about the link between Plaintiff's speech and Defendants' retaliation, thus showing that holding Defendants liable will not open the floodgates to frivolous litigation, especially given a) the premeditated plan by Defendants; b) the utter lack of a legitimate connection between the protected speech and the counts in the Civil Complaint; and c) there is no legitimate way in which Defendants could have considered the content and viewpoint of Plaintiff's speech in their decision to investigate and then bring the Civil Complaint on September 3, 2025.

83. Plaintiffs' speech constitutes speech on matter of public concern in that it transcends the Plaintiffs' private interest and raises social and cultural issues of the greatest import, which lies close to the core of the area protected by the First Amendment.

84. Further still there is objective evidence that Plaintiffs were investigated and then subjected to the Civil Complaint when other similarly situated entities and individuals have not been accosted.

## II.
## JAMES'S OFFICE INTENTIONALLY OR RECKLESSLY MISTSTATES FACTS AND OFFERS CLEARLY ERRONEOUS LEGAL CONCLUSIONS TO THE NEW YORK STATE COURT TO JUSTIFY ITS HARASSING CHARITIES SUBPOENA.

85. As stated, on or about June 24, 2022, Defendants served VDARE with the Charities Subpoena. *Exhibit 1 above.*

86. The Charities Subpoena demanded detailed and copious information regarding VDARE's donors, anonymous writers, officers, directors, employees, agents, tax returns, customers for VDARE's books and other educational materials, corporate minutes dating back to 1999, solicitations, purchase of buildings, persons attending conferences at VDARE's buildings including any purchases of books or other items they may have made, all of VDARE's financial records including bank statements, credit card statements, copies of checks, communications relating to its financial records, documents relating to any business or personal relationships between any current or former officers directors, or employees of VDARE and any other current or former officer, director, or employee of VDARE, all documents relating to any renovations or improvements it has made to its buildings, and many other topics.

87. No aspect of the Charities Subpoena or any of the other subpoenas was motivated by a legitimate inquiry, just as no aspect of the Civil Complaint (*Exhibit 3 above*) was motivated by a legitimate law enforcement objective.

88. Numerous aspects of the Charities Subpoena make clear that it was designed to, and did, gravely damage VDARE and thereby severely limit or even put an end to VDARE's First Amendment protected advocacy, of which the Defendant James and all other Defendants disapprove.

89. These aspects include:

a.  the subpoena's multiple violations of First Amendment protections established by decisions of the Supreme Court and other federal courts (including the unmasking of anonymous authors criticizing government policy – an effective strategy for free speech recognized since colonial times, and the discovery of donors to a controversial group espousing dissident speech);

b.  the subpoena's lack of connection to or grounding in any wrongdoing or alleged wrongdoing by VDARE; and

c.  the overall burdensomeness of the subpoena, especially in light of the fact that VDARE is a small organization with limited resources.

90. They are explained solely by Defendant Sawyer's stated desire to "corral" speakers in what they are "allowed to do" and drive home the reality that "it sucks to be sued" because litigation is "massively expensive," opening one's "whole life up to discovery," ruining one's credit and "ruin, you know, your opportunity to do a lot of things that you would otherwise be doing with your time," as stated in *Taking Hate to Court circa 31:28*.

91. The Defendants herein have falsely waved the danger of various infractions of New York's NPCL before the courts to justify their  massively invasive subpoenas, but the reality is that any such concerns could and should have been laid to rest with a handful of documents, rather than the sprawling legal and administrative quagmire that has engulfed VDARE for the last three years.

92. Defendants have falsely indicated that their chief concern has allegedly been that two of VDARE's directors (Peter Brimelow and Lydia Brimelow) had appropriated the historic Berkely Springs Castle in Berkeley Springs, West Virginia and violated several provisions of the NPCL in doing so.

93. The most concise statement Defendants have made on this point is as follows:

> In December 2020, VDARE conveyed the entirety of the Berkeley Springs Castle property—bought with charitable funds—to two West Virginia corporations incorporated by Lydia Brimelow, Peter's wife and a VDARE director, five months earlier.  VDARE conveyed the castle itself and the land that it sits on to the Berkeley Castle Foundation (BCF), a putative nonprofit corporation.  And it conveyed the remaining land, consisting of eight parcels, to BBB, LLC, a for-profit corporation. Id. ¶ 28. These transactions by a New York charitable not-for-profit require submission of a petition by VDARE for review and approval by the Attorney General or the Supreme Court under Sections 510, 511, or 511-a of the Not-for-Profit Corporation Law. Each transaction also would require, under Section 509 of the N-PCL, approval by disinterested members of the VDARE Board of Directors. Because the Brimelows were together two of VDARE's three directors according to VDARE's 2020 Form 990 (the third being Peter Brimelow's brother), no approval by disinterested directors could possibly have been granted.
> Each of the castle and compensation transactions is also a "related-party transaction" under Section 715 of the Not-For-Profit Corporation Law that requires review by disinterested board members to ensure fair consideration and examination of alternatives, contemporaneous record-keeping, and proper disclosure on Schedule L of the IRS 990.
>
> (*quoting pp. 6-7 of Record Entry 3 of New York Supreme Court, New York County Index No. 453196/2022, which in turn relies upon an affirmation supplied by Defendant Fuchs.*)

94. This is complete nonsense – and could easily be shown to be false with a handful of documents, rather than the millions VDARE had to sift through, nor the thousands VDARE was forced to produce through the services of an e-discovery vendor (over seven thousand to date).

95. The transfer of the Berkeley Castle and lands referenced above (*viz.* the "Castle Transactions") was done to strategically limit liability in much the same way many responsible business owners divide assets for protection.

96. To address the alleged suspicions of violations of NPCL §§509 and 715, under New York law, directors and officers are interested parties *vis-a-vis* challenged transactions where

they receive direct financial benefits different from the benefit received by shareholders generally.

97. However, neither Peter Brimelow nor Lydia Brimelow ever received any financial benefit from the Castle Transactions (direct or otherwise):

    a.   they did not own the Berkeley Castle Foundation, Inc. (which itself was a charitable entity without shareholders, a fact which Defendants had ascertained before making their reckless statement to the New York state court on December 16, 2022); and

    b.   VDARE itself was the sole owner of the "for-profit" BBB, LLC, a fact which could have been explained by checking the VDARE board minutes from May 1, 2020 – a single document.  Any further questions could and should have been resolved with a simple affidavit or confirmation by an operating agreement from BBB, LLC.

98. Thus, as a matter of law neither Peter Brimelow, nor Lydia Brimelow were "interested parties" in the Castle Transactions as that term is used in New York law and thus there could be no violations of NPCL §§509 and 715.

99. Once again, Defendants's statement to the contrary was reckless or intentionally false.

100.    Indeed, it is notable that in the Civil Complaint Defendants never actually alleges that Peter or Lydia Brimelow (or any other individuals) were financially interested in the Castle Transactions.

101.    But having already intentionally or recklessly misstated the facts and law to feign violations of New York's NPCL, Defendants went on to intentionally or recklessly abuse IRS regulations to paint a further false picture of VDARE's directors.

102.     The Berkeley Castle Foundation is a "a Type II supporting organization under IRC Section 509(a)(3)," a fact which Defendant had again determined prior to making their submission to the New York state court on December 16, 2022.

103.     As a Type II supporting organization, IRS regulations require the Berkely Castle Foundation "be supervised or controlled in connection with its supported organization(s)." See entry for "Relationship Test / Type II" at https://www.irs.gov/charities-non-profits/charitable-organizations/supporting-organizations-requirements-and-types (accessed May 13, 2025)

104.     The Berkeley Castle Foundation was created in order to support VDARE itself, and to maintain the Castle on behalf of VDARE.

*105.*     That such is its purpose could and should have been confirmed by checking the organization's Bylaws.

106.     The IRS's own website acknowledged that this supervision and control will typically be accomplished "by having a majority of the directors or trustees of the supported organization(s) serve as a majority of the trustees or directors of the supporting organization."   It goes on to note that "The relationship between the supported organization(s) and the supporting organization is sometimes described as similar to a brother-sister relationship."   (see entry under "Relationship Test / Type II" at https://www.irs.gov/charities-non-profits/charitable-organizations/supporting-organizations-requirements-and-types, accessed on May 13, 2025)

107.     Thus the IRS's own website plainly calls for overlapping directorships between a Type II supporting organization and the charitable entity that it supports.

108.     VDARE simply followed this directive by ensuring there were overlapping directors on both the VDARE board and the Berkely Castle Foundation's board.

109.     There was therefore nothing untoward, usual, or suspicious in the fact that Peter and Lydia served as directors of both VDARE and the Berkely Castle Foundation – *though Defendants took exactly that position in their submissions to the New York court on December 16, 2022.*

110.     Instead of noting that VDARE was simply following the IRS guidelines, Defendants used the fact that Peter and Lydia Brimelow were on both boards to falsely imply evidence of misconduct – a so-called "web of transactions among VDARE and Brimelow-controlled entities *already* discovered by the OAG" — to justify the massively invasive Charities Subpoena, as in the following:

> "Given the web of transactions among VDARE and Brimelow-controlled entities *already* discovered by the OAG, the identities of contractors are central to the OAG's investigation. VDARE, and the Brimelows, cannot hide behind the First Amendment to shield self-interested transactions from regulatory scrutiny."
>
> *quoting at p. 16 of Record Entry entry 3 of New York Supreme Court, New York County Index No. 453196/20220, relying in turn on affirmation of Defendant Fuchs.*

111.     The "web of transactions" Defendants stressed to the New York state courts is nothing more than what the IRS website calls for at  https://www.irs.gov/charities-non-profits/charitable-organizations/supporting-organizations-requirements-and-types,  which states that the Berkeley Castle Foundation and VDARE should maintain overlapping boards.

112.     Moreover Defendants Fuchs, as an experienced attorney in the Charities Division of James's office knew of these IRS regulations.

113.      Once again, Defendants therefore made reckless allegations to the New York courts – or they were intentionally misstating the facts to the New York courts to excuse their abusive and overreaching Charities Subpoena.

114.     Moreover, all Defendants have played a significant part in the harassment of VDARE.

115.     Defendant James has overseen this harassing investigation and was copied on a letter from VDARE's counsel dated August 1, 2023 which drew many of these abuses to her specific attention, but she has intentionally pressed on with her abusive investigation of VDARE and now with frivolous litigation by the filing of the Civil Complaint.

116.     Indeed all other Defendants have intentionally harassed VDARE here pursuant to a policy adopted by James herself whereby those in her office are encouraged to violate the First Amendment rights of citizens under the guise of combating the phony category of hate speech, with Defendant Sawyer's remarks at *Taking Hate to Court* and James's own August 3rd Letter being part of that malign pattern.

117.     Defendant Fuchs worked closely with Defendant Sawyer at the beginning of this abusive investigation; and of course Defendant Fuchs submitted recklessly or intentionally false statements to the New York state court on December 16, 2022 because she shared his and Defendant James's desire to suppress protected speech with abusive litigation.

118.     And Defendant Sawyer has been a key player in this willfully abusive investigation, signing the first two   subpoenas seeking information on VDARE and overseeing the

abusive litigation strategy with regard to the Charities Subpoena, even appearing as counsel on briefs throughout 2024 and reviewing and demanding ever more information from VDARE at various state court conferences over the last several years regarding the Charities Subpoena; and now appearing as a signatory on the Civil Complaint.

### III.
### VDARE ENAGES IN CORE POLITICAL SPEECH THAT IS CRITICAL OF GOVERNMENT POLICY, WHICH INPIRES HOSTILITY AND HYPOCRISY IN JAMES AND OTHER STATE ACTORS.

119.    VDARE engages in core political speech that is critical of current government policy.

120.    VDARE engages in the rational exposition of ideas, specifically ideas about our immigration laws, race, ethnicity, and culture.

121.    VDARE does not even remotely stoop to words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace" – which is what Defendants falsely imply by the pejorative term "hate speech."   On the contrary, VDARE publishes speech which appeals to reason and invites debate, and does so in simple prose journalism and opinion on its website.

122.    However, VDARE publishes precisely the kind of speech James and her fellow Defendants have attacked as "hate speech" and "white nationalist," as in the August 3rd Letter and Defendant Sawyer's remarks in Taking Hate to Court.

123.    In particular, VDARE regularly reminds readers that the Great Replacement is no conspiracy, but a cold, hard fact.

124.    For example, on June 12, 2022, VDARE ran an article by the anonymous writer "Washington Watcher II," which was entitled "The Great Replacement Now Drives American Political Discourse." This article is both relevant and a good example of what VDARE would publish.

125.    Furthermore, VDARE regularly reminds its readers that the effects of current immigration policy are exactly the opposite of what our government had promised us.

126.    During the Senate debate on the Hart-Celler 1965 Immigration & Nationality Act (then identified on the Senate floor as S.500), Senator Edward M. Kennedy urged passage of the bill in the following words:

> "Out of deference to the critics, I want to comment on … what the bill will not do. *First, our cities will not be flooded with a million immigrants annually. Under the proposed bill, the present level of immigration remains substantially the same …* Secondly, the ethnic mix of this country will not be upset … Contrary to the charges in some quarters, S.500 will not inundate America with immigrants from any one country or area, or the most populated and economically deprived nations of Africa and Asia. *In the final analysis, the ethnic pattern of immigration under the proposed measure is not expected to change as sharply as the critics seem to think. Thirdly, the bill will not permit the entry of subversive persons, criminals, illiterates, or those with contagious disease or serious mental illness.* As I noted a moment ago, no immigrant visa will be issued to a person who is likely to become a public charge … the charges I have mentioned are highly emotional, irrational, and with little foundation in fact. They are out of line with the obligations of responsible citizenship. They breed hate of our heritage." (emphasis supplied))

127.    Every single one of Senator Kennedy's promises and predictions above have proved false:

a.    the Hart-Celler 1965 Immigration & Nationality Act has resulted in our nation's cities being flooded with millions of immigrants annually;

b.    the then present level of immigration did not remain substantially the same, but increased dramatically;

c.  the ethnic *and even racial* composition of the nation has been upset, to the point that whites are destined under current policy to become a minority;

d.  America has been inundated with immigrants from one area, namely the Third World, with a particularly heavy contribution from Latin America and Mexico;

e.  in the final analysis, the ethnic pattern of immigration did change sharply; and

f.  the bill has permitted the entry of subversive persons – including those who committed Islamic jihad in 1993 and 2001 — as well as sundry criminals, such as the murderer Colin Ferguson (a Jamaican immigrant), or the child murderer Arthur Prince Kollie (an African Immigrant), who slowly tortured and then killed a young girl named Daisy "Jupiter" Paulsen in Fargo, North Dakota on June 4, 2021.

128.    Nor was Senator Edward M. Kennedy alone in his false promises regarding the future ethnic (and racial) balance of the nation. His brother, Senator Robert F. Kennedy of New York, urged passage of the Hart-Celler 1965 Immigration & Nationality Act in the following words:

> "In fact, the distribution of limited quota immigration can *have no significant effect on the ethnic balance of the United States*. … Total quota immigration is now 156,782; under the proposed bill, it would rise to 164,482. Even if all these immigrants came from Italy, for example, the net effect would be to increase the number of Italo-Americans by one-tenth of 1 percent of our population this year, and less as our population increases. Americans of Italian extraction now constitute about 4 percent of our population; at this rate, considering our own natural increase, it would take until the year 2000 to increase that proportion to 6 percent. Of course, S.500 would make no such radical change. Immigration from any single country would be limited to 10 percent of the total-16,500-with the possible exception of the two countries now sending more than that number, Great Britain and Germany. *But the extreme case should set to rest any fears that this bill will change the ethnic, political, or economic makeup of the United States*. (emphasis supplied)

129.     As for the co-sponsor of the bill, Senator Philip Hart of Michigan, he stated the following:

> "… the notion was created that somehow or another, 190 million [the population of the U.S. in 1965] *is going to be swallowed up. None of us would want that, this bill does not seek to do it and the bill could not do it*." (emphasis supplied)

130.     Again, these promises proved hollow: the ethnic balance of the nation is being changed, drastically, to the point where whites, an extreme majority of almost 90% in 1965, are projected to be driven to minority status within 100 years of the passage of the Hart-Celler 1965 Immigration & Nationality Act.

131.     Defendants, however, are corrupt state actors who cannot abide citizens who note that our government misled us in the passage of the Hart-Celler 1965 Immigration & Nationality Act.

132.     Nothing daunted, VDARE regularly reminded its readers of the falsity of our government's promises. Indeed it did so numerous times, such that the reality of the Great Replacement, and the government's false promises about that issue, can accurately be described as VDARE's abiding interest.

133.     More than that, VDARE has often stressed that the government appears to be not simply wrong about immigration, but even deliberately lying about the Great Replacement.

134.     These lies are most evident in the fact that our government simultaneously celebrates the fact that the racial make-up of our nation is changing drastically *and* derides discussion by those who oppose that change as an alleged "conspiracy theory."

135.     One of the more prominent government officials who openly celebrates the Great Replacement is former President and Vice President Joseph Biden.

136.    In 2015, speaking from the White House itself, then Vice President Biden specifically drew attention to the replacement of the white stock of this nation by an "unrelenting stream of immigration" that would eventually relegate whites to minority status.  Said then Vice President Biden:

> "An unrelenting stream of immigration. Nonstop, nonstop. Folks like me who are Caucasian, of European descent, for the first time in 2017[*sic – presumably he meant  2070*] we'll be an absolute minority in the United States of America. Absolute minority. Fewer than 50% of the people in America from then and on will be white European stock. That's not a bad thing. That's a source of our strength."

A hyperlink to a true copy of then Vice President Biden delivering those remarks at the White House on February 17, 2015 can be found here: https://www.c-span.org/video/?c4926142/user-clip-joe-biden-unrelenting-stream-immigration

137.    President Biden's remarks on February 17, 2015 are consistent with decades old celebrations  by Democrats of the Great Replacement.

138.    For example, on June 13, 1998, then President Bill Clinton gave a commencement speech at Portland State University in Oregon, wherein he stated:

> "*The driving force behind our increasing diversity is a new, large wave of immigration.  It is changing the face of America…*   [W]e are being tested again — by a new wave of immigration larger that any in a century, far more diverse than any in our history.  Each year, nearly a million people come legally to America.  Today, nearly one in ten people in America was born in another country; one in five schoolchildren is from immigrant families. *Today, largely because of immigration, there is no majority race in Hawaii or Houston or New York City. Within five years there will be no majority race in our largest state, California. In a little more than 50 years there will be no majority race in the United States. No other nation in history has gone through demographic change of this magnitude in so short a time*." (emphasis supplied)

139.     Another, more malicious example: In 1994, Art Torres, then Chairman of the California Democratic Party, promised that Proposition 187 – a California ballot initiative to deny non-emergency health care, public education, and other services to illegal aliens — "was the last gasp of white America in California."

140.     In none of the above examples were any of the speakers who celebrated the coming end of America's white majority attacked on the floor of Congress or by the New York Attorney General as engaging in "hateful conspiracy theories," as Defendant James did in her August 3rd letter or as Defendant Sawyer implied in his remarks during Taking Hate to Court.

141.     This signals that if one welcomes the coming demographic and political displacement of America's white majority by government policy, one is free from government censure.  But not so if one takes the opposite view and decries the coming demographic and political displacement of America's white majority.

142.     For example, on June 8, 2022, in a resolution introduced by Congressman Jamaal Bowman of New York, the House of Representative condemned "in the strongest terms" the (alleged) "theory" of the Great Replacement, claiming that there was no effort underway to replace white Americans with people of color.  That theory was allegedly false, according to Representative Bowman, and (to quote him directly) "is a racist, antisemitic, Islamophobic, xenophobic, nativist and hateful lie."

143.     The result is an Orwellian scenario where if one cheers on the governmental policies leading to the Great Replacement, one can speak openly without condemnations by the United States Congress or other state actors, but if one laments the process of the

Great Replacement, then one is maligned as a racist by the United States Congress and risks being threatened with investigation by the New York Attorney General.

144.    Defendant James in particular hates talk of the Great Replacement, owing to what she believes is the bad tendency of such speech.

145.    By contrast, James, herself a black woman, is receptive to black nationalist ideals, even black nationalist ideals connected to the violent and murderous movement known as Black Lives Matter.

146.    Murder and mayhem have been consistent features of the Black Lives Matter protests from early in the movement, but in a revealing double standard, neither Defendant James, Defendant Sawyer, nor any other Defendant has betrayed any worry of the "bad tendency" of BLM's speech.

147.    And this is so even though New York in particular has been an unfortunate recipient of that black nationalist violence, as in the brazen daylight murder on December 20, 2014 of New York City Police Officers Wenjian Liu and Rafael Ramos, which occurred in the wake of BLM protests ignited by the death of Michael Brown in August of that year.

148.    New York authorities determined that Officers Wenjian Liu and Rafael Ramos were killed by black criminal Ismaaiyl Brinsley, who was motivated by black nationalist ideals and who posted the following to a social media account on the day of the murder: "I'm Putting Wings On Pigs Today. They Take 1 Of Ours...Let's Take 2 of Theirs."

149.    Finally, in the wake of George Floyd's death on May 25, 2020, Black Lives Matter riots occurred month after month, nationwide, from Portland, Oregon to New York, New York (whose riots went on intermittently from May 2020 to December 2020), which resulted in over $2 Billion in property damages and numerous deaths and murders, such as

the murders of David Dorn in St. Louis, Missouri on June 2, 2020, or Tyler Gerth in Louisville, Kentucky on June 27, 2020, or Jessica Doty Whitaker (a young mother) in Indianapolis, Indiana on July 5, 2020, who was murdered by a Black Lives Matter partisan after walking past a group of Black Lives Matter protestors because she and her group would only say "all lives matter."

150.    Nevertheless, because Black Lives Matter involves political speech that Defendants support, they turn a blind eye to any tendency to violence on the part of Black Lives Matter protests.  Instead, where Black Lives Matter is concerned, James and her fellow Defendants suddenly recognize that the bad tendency of speech cannot be a justification to suppress it.

*151.*    Indeed, Defendant James has gone so far as to use her office to publicly support Black Lives Matters rioters by filing suit on behalf of many engaged in the actual riots in New York, New York.  Specifically, James filed suit on January 14, 2021 in the Southern District of New York on behalf of the rioters, *as found at "People of the State of New York, by Letitia James, Attorney General of the State of New York v. City of New York, et al.," Case No. 1:21-cv-00322."*

**IV.**

**JAMES AVERTS HER EYES FROM THE OBVIOUS INDICATORS OF MALFEASANCE REGARDING BLACK LIVES MATTERS, AND RAMPANT DEPRADATIONS AT BUSHWICK AND CORE — WHILE CASTING EVIL EYES AT VDARE IN A BRAZEN VIOLATION OF EQUAL PROTECTION.**

152.    Patrisse Cullors is a prominent black nationalist associated with the Black Lives Matter.

153.    Although there are many different and de-centralized organizations associated with the larger Black Lives Matter movement, the particular Black Lives Matter organization

with which Patrisse Cullors has been associated is the entity "Black Lives Matter Global Network Foundation, Inc."

154.    Black Lives Matter Global Network Foundation, Inc. is a Delaware Not for Profit Corporation registered in New York State under State Registration No. 48-36-62.

155.    The Certificate of Incorporation for Black Lives Matter Global Network Foundation, Inc. on file with New York State indicates that it was incorporated by Patrisse Cullors in 2017 and was in fact signed by Patrisse Cullors.

156.    In 2021, Black Lives Matter Global Network Foundation, Inc. filed a CHAR 410 Registration Statement for Charitable Organizations (bearing a signature date of August 2, 2021 by its president) with the New York Attorney General indicating that it both planned to and already was soliciting donations in New York State.

157.    These donations appear to dwarf what VDARE takes in, as set forth below.

158.    In 2022, Black Lives Matter Global Network Foundation, Inc. filed a CHAR 500 Annual Filing for Charitable Organizations (dated June 8, 2022, but for the fiscal year ending December 31, 2020) with the New York Attorney General indicating that its total contributions from New York State residents exceeded the $25,000 threshold indicated on the form.

159.    Although Black Lives Matter Global Network Foundation, Inc. indicates that it was incorporated in 2017 and that it had already been soliciting in New York, the above CHAR 500 Annual Filing for Charitable Organizations for the fiscal year ending December 21, 2020 was for several years the only one on file with James's office.

160.    That same CHAR 500 Annual Filing for Charitable Organizations indicated that Black Lives Matter Global Network Foundation, Inc. had total revenue of over $79 Million and net assets of over $41 Million, along with over $76 Million in total contributions.

161.    By contrast, VDARE's CHAR 500 Annual Filing for Charitable Organizations was for 2019, which listed total revenue of $4.3 Million and nets assets of $3.5 Million, which shows the most assets it ever had.

162.    Based on the above, Black Lives Matter Global Network Foundation, Inc. has net assets that are apparently ten times as large as VDARE at its best; and there is a much greater discrepancy (some $38 Million) between the revenue received and remaining assets of Black Lives Matter Global Network Foundation, Inc.

163.    No later than April 10, 2021, reports began to surface in national media from *The New York Post* to *BuzzFeeed News* to *New York Magazine* that highlight alleged murky finances surrounding Patrisse Cullors and the BLM charity specifically registered in New York (Black Lives Matter Global Network Foundation, Inc.), with *The New York Post*, for example, reporting that Ms. Cullors had recently gone on a real estate spending spree in which she expended almost $3 Million.

164.    A *New York Magazine* article dated January 21, 2022 entitled, "The BLM Mystery: Where did the money go?" reported that as early as November 2020, ten chapters of the Black Lives Matter Global Network Foundation issued a public call for greater financial accountability. "'For years there has been inquiry regarding the financial operations of BLMGNF and no acceptable process of either public or internal transparency about the unknown millions of dollars donated to BLMGNF, which has certainly increased during this time of pandemic and rebellion,' the chapters' statement read."

165.    Said *New York Magazine* article also provided some indication the Patrisse Cullors and Black Lives Matter Global Network Foundation, Inc. may have run afoul of § 715 of New York's Not for Profit Corporations Law, "Related party transactions" (which is fully applicable to Black Lives Matter Global Network Foundation, Inc. under§ 103 of New York's Not for Profit Corporations Law, "Application").

166.    This is one of the very same laws that James's office has invoked to justify her scrutiny of VDARE.

167.    Upon information and belief, neither Defendant James nor any other Defendant has bothered to undertake any examination, administrative or otherwise, of Black Lives Matter Global Network Foundation, Inc., Patrisse Cullors, or her related entities such as Dignity and Power Now, JusticeLA, or the Justice Teams Network.

168.    Upon information and belief, James has never served any subpoenas on Black Lives Matter Global Network Foundation, Inc., Patrisse Cullors, or her related entities such as Dignity and Power Now, JusticeLA, or the Justice Teams Network.

169.    This is not because investigating any such person or entities would prove difficult for James.

170.    Indeed, documents on file with the New York Attorney General indicate that any legal process could easily be served on Black Lives Matter Global Network Foundation, Inc. at either Black Lives Matter Global Network Foundation, Inc., 248 3rd Street, 305 Oakland CA 94607, Attn: Raymond Howard or Black Lives Matter Global Network Foundation, Inc., c/o 1209 Orange Street, Corporation Trust Center, New Castle County, Wilmington, Delaware, 19801.

171.    In addition, large corporations with a New York presence – including but not limited to Amazon, Inc., Facebook, and IBM – have advertised substantial donations to the Black Lives Matter movement.

172.    The New York presence of such corporations could also provide ease and incentive for James to at least begin to follow the alleged missing money associated with Black Lives Matter Global Network Foundation, Inc. and Patrisse Cullors.

173.    But James has not subjected Black Lives Matter Global Network Foundation, Inc. to the burden of administrative scrutiny.

174.    And James has no intention of subjecting Black Lives Matter Global Network Foundation, Inc. to the burden of administrative scrutiny.

175.    This is not due to any legitimate prosecutorial discretion exercised by James.

176.    This is rather because James favors the speech of the obviously corrupt Black Lives Matter Global Network Foundation, Inc., even as she hates the speech of the obviously clean VDARE.

177.    Nor is Black Lives Matter Global Network Foundation, Inc. the only comparator VDARE offers of a charity similarly situated which was deliberately spared the selective treatment inflicted on VDARE treated because Defendants were motivated by an intention to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the VDARE.

178.    As shown above, VDARE also proffers the New York based charities Bushwick and CORE, amongst others.

## COUNT ONE

## (FIRST AMENDMENT RETALIATION / SECTION 1983 CLAIM BASED ON THE CHARITIES SUBPOENA AGAINST ALL DEFENDANTS INDIVIDUALLY)

179.    VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

180.    The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, secures VDARE's right to free speech, including its right to express political beliefs concerning America's immigration law and policies, and its freedom of association.

181.    VDARE has a decades-long history of dissident speech advancing its views on immigration policy and reform, which is speech at the very core of the area protected by the First Amendment.

182.    Defendants's actions — including their issuance of the subpoena described in this complaint and any investigation into VDARE's tax-exempt status and enforcement of the subpoena by reckless or intentionally false statements — were done under color of state law.

183.    Defendants's actions were undertaken directly in response to and substantially motivated by VDARE's protected speech and its exercise of its right of association.

184.    Defendants have acted herein with the intent to obstruct, chill, deter, and retaliate against VDARE's core political speech and freedom of association, which are protected by the First Amendment.

185.    Defendants's actions were motivated by evil intent and the callous disregard of constitutional rights, justifying punitive damages to the fullest extent of the law.

186.        Defendants's acts would chill a reasonable person from continuing to participate in, observe, record, and report on speech disfavored by the government.

187.        VDARE has been damaged thereby, including in the chill that accompanies receipt of these subpoena, the need to hire counsel to respond to them, and the burden of frivolous litigation, well in excess of $75,000.

WHEREFORE Plaintiff VDARE respectfully requests compensatory and punitive damages in an amount to be determined at trial.

## COUNT TWO

### (SELECTIVE ENFORCEMENT BASED ON THE CHARITIES SUBPOENA AGAINST ALL DEFENDANTS INDIVIDUALLY)

188.         VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

189.        The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from uneven application of the law based on an impermissible standard.

190.        Discrimination based on political speech and associations is such an impermissible standard.

191.        The subpoena at issue here was served with an evil eye and an unequal hand.

192.        VDARE has been selectively treated compared with other similarly situated charities, such as black nationalist charities, including but not limited to Black Lives Matters Global Networking Foundation, Inc., and New York based black run charities, such as Bushwick and CORE, which have much more obvious and glaring problems concerning their finance, filings, and possible misuse of donor funds.

193.    Indeed, in the lead up to this litigation, James's office took the position that it wanted to investigate VDARE because of VDARE's role in the purchase of the Berkeley Springs Castle (a real estate transaction from 2020 totaling $1.4 Million) and because of possible improper related party transaction under §715 of New York's Not for Profit Corporations Law.

194.    These concerns are obviously dwarfed by the potential malfeasance surrounding Black Lives Matter Global Network Foundation, Inc. detailed above, which also include questionable real estate transactions and related party transactions.

195.    They are also dwarfed by the rampant abuses of New York based black run charities, such as Bushwick and CORE, which demonstrate hundreds of thousands or even tens of millions of dollars in unlawful related party transactions and other violations.

196.    Such selective targeting of VDARE is based on impermissible considerations, specifically it is based on retaliation for core protected speech of which James and fellow Defendants strongly disapprove as "white nationalist" or "Great Replacement [so-called] conspiracies."

197.    Such selective targeting of VDARE is not the result of any legitimate discretion.

198.    Defendants's decision to impose massive, invasive, and unconstitutional subpoena requests on VDARE in response to and substantially motivated by VDARE's political speech and its exercise of its right of association demonstrates selective enforcement of New York's not-for-profit law.

199.    Defendants's actions were motivated by evil intent and the callous disregard of constitutional rights, justifying punitive damages to the fullest extent of the law.

200.      VDARE has been damaged thereby, including in the chill that accompanies receipt

of the subpoena, the need to hire counsel to respond, and the burden of frivolous litigation,

well in excess of $75,000.

WHEREFORE Plaintiff VDARE respectfully requests compensatory and punitive damages in an

amount to be determined at trial.

### COUNT THREE

### (FIRST AMENDMENT RETALIATION / SECTION 1983 CLAIM BASED ON THE CIVIL COMPLAINT AGAINST DEFENDANTS JAMES, SHEEHAN, SAWYER, FAUX, STERN, FINN, AND LIEBOWITZ INDIVIDUALLY)

201.      VDARE repeats and re-alleges every allegation in the preceding paragraphs as

though fully set forth herein.

202.      The First Amendment, which applies to Defendants by operation of the Fourteenth

Amendment, secures VDARE's right to free speech, including its right to express political

beliefs concerning America's immigration law and policies, and its freedom of association.

203.      VDARE has a decades-long history of dissident speech advancing its views on

immigration policy and reform, which is speech at the very core of the area protected by

the First Amendment.

204.      Defendants's actions — including their filing of the Civil Complaint on September

3, 2025 described herein — were done under color of state law.

205.      Defendants's actions were undertaken directly in response to and substantially

motivated by VDARE's protected speech and its exercise of its right of association.

206.        Defendants have acted herein with the intent to obstruct, chill, deter, and retaliate against VDARE's core political speech and freedom of association, which are protected by the First Amendment.

207.        Defendants's actions were motivated by evil intent and the callous disregard of constitutional rights, justifying punitive damages to the fullest extent of the law.

208.        Defendants's acts would chill a reasonable person from continuing to participate in, observe, record, and report on speech disfavored by the government.

209.        VDARE has been damaged thereby, including in the chill that accompanies burdensome litigation, well in excess of $75,000.

WHEREFORE Plaintiff VDARE respectfully requests compensatory and punitive damages in an amount to be determined at trial.

## COUNT FOUR

### (SELECTIVE ENFORCEMENT AGAINST VDARE IN VIOLATION OF THE 14th AMENDMENT BASED ON THE CIVIL COMPLAINTAGAINST DEFENDANTS JAMES, SHEEHAN, SAWYER, FAUX, STERN, FINN AND LIEBOWITZ)

210.        VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

211.        The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from uneven application of the law based on an impermissible standard.

212.        Discrimination based on political speech and associations is such an impermissible standard.

213.        The Civil Complaint at issue here was filed and served with an evil eye and an unequal hand.

214.    VDARE has been selectively treated compared with other similarly situated charities, such as black nationalist charities, including but not limited to Black Lives Matters Global Networking Foundation, Inc., and New York based black run charities, such as Bushwick and CORE, which have much more obvious and glaring problems concerning their finances, filings, and possible misuse of donor funds.

215.    Indeed, in the lead up to this litigation, James's office took the position that it wanted to investigate VDARE because of VDARE's role in the purchase of the Berkeley Springs Castle (a real estate transaction from 2020 totaling $1.4 Million) and because of possible improper related party transaction under §715 of New York's Not for Profit Corporations Law.

216.    These concerns are obviously dwarfed by the potential malfeasance surrounding Black Lives Matter Global Network Foundation, Inc. detailed above, which also include questionable real estate transactions and related party transactions.

217.    They are also dwarfed by the obvious and rampant abuses of New York based black run charities, such as Bushwick and CORE, which demonstrate hundreds or even tens of millions of dollars in unlawful related party transactions and other violations.

218.    Such selective targeting of VDARE is based on impermissible considerations, specifically it is based on retaliation for core protected speech of which James and fellow Defendants strongly disapprove as "white nationalist" or "Great Replacement [so-called] conspiracies."

219.    Such selective targeting of VDARE is not the result of any legitimate discretion.

220.    Defendants's decision to impose massive, frivolous and burdensome litigation on VDARE, in response to and substantially motivated by VDARE's political speech and its

exercise of its right of association, demonstrates selective enforcement of New York's not-for-profit law.

221.    Defendants's actions were motivated by evil intent and the callous disregard of constitutional rights, justifying punitive damages to the fullest extent of the law.

222.    VDARE has been damaged thereby, including in the chill that accompanies the burden of frivolous litigation, well in excess of $75,000.

WHEREFORE Plaintiff VDARE respectfully requests compensatory and punitive damages in an amount to be determined at trial.

## COUNT FIVE

## (SECTION 1985 (3) CONSPIRACY – AGAINST ALL DEFENDANTS INDIVIDUALLY)

223.    VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

224.    The Defendants are all persons within the State of New York

225.    The ADL and ADL attorney Steve Freeman were also persons within the State of New York during *Taking Hate to Court*.

226.    The Defendants conspired with the ADL and ADL attorney Steve Freeman by agreeing to use New York not for profit and other laws to harass and burden VDARE because of its protected speech, as suggested in the *June 2021 ADL Report*.  *Exhibit 2 above.*

227.    Defendant Sawyer agreed to do so at some point before he signed the Meta Subpoena referenced above.

228.    Defendant Sawyer reiterated his commitment to this conspiracy with the ADL and ADL attorney during *Taking Hate to Court*, as indicated by his statements generally and also when Steve Freeman said that the ADL had been specifically "working with Rick Sawyer" to go after extremists and hate online by using the powers that they (*viz*. the states attorneys general) *circa. Taking Hate to Court 47:02, 47:55*.

229.    Defendant Sawyer openly boasted of aspects of the conspiracy during *Taking Hate to Court* in New York in November of 2022.

230.    All other Defendants knew of the conspiracy and took counsel from the June 2021 ADL Report, contrary to decades of binding free speech precedent.

*231*.    All Defendants joined in the conspiracy by serving and enforcing the Charities Subpoena (*Exhibit 1 above*) and now in filing the Civil Complaint. *Exhibit 3 above.*

232.    Said Defendants did so for the purposes of depriving VDARE, either directly or indirectly, from enjoying the equal protection of the laws permitting it to speak on political issues at the core of the First Amendment.

233.    Said Defendants did so for the purpose of preventing the State of New York from giving or securing all persons within the State of New York from enjoying the equal protection of the laws to speak.

234.    The said Defendants' improper and unconstitutional conduct harmed VDARE, causing it to lose income, divert money from its mission, and lose the ability to speak in a timely manner, with a threat now of permanently silencing VDARE.

235.    Because the Defendants' actions constituted malicious and wanton misconduct, VDARE is entitled to punitive damages.

WHEREFORE Plaintiff VDARE respectfully requests compensatory and punitive damages in an amount to be determined at trial.

## COUNT SIX

## (DECLARATORY RELIEF AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

236.     VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

237.     As indicated by Defendant Sawyer at the ADL Conference in November of 2022, the Defendants have settled on a policy of regulating based on hostility or favoritism towards underlying speech, *viz.* "So by targeting these groups in creative ways, by targeting groups that are fomenting hate, but also violating the law while they're doing it you're taking the megaphone away from the people who are inspiring the street level kinds of crime that do get prosecuted and you're taking much bigger bite out of the apple." *Taking Hate to Court circa. 26:30.*

238.     This policy is forbidden by decades of binding precedent under the First Amendment, such as *Louisiana ex rel. Gremillion v. NAACP,* 366 U.S. 293, 297 (1961) (noting the abuse of "regulatory measures" "to stifle... the exercise of First Amendment rights" is forbidden) and *R.A.V. v. City of St. Paul,* 505 U.S. 377, 386 (1992) (noting that the government cannot regulate "based on hostility – or favoritism – towards the underlying message expressed.")

239.     The case presents one of the preeminent dangers to constitutional rights identified in *Lozman v. City of Riviera Beach*, 585 U.S. 314, 320–23 (2018): "An official retaliatory policy" which "is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive" which is "difficult to dislodge."

240.      Indeed, Defendant Sawyer himself underscored just how pervasive and difficult to dislodge this unlawful policy would be when he revealed that the policy was being promoted by his office to other unnamed states attorneys general across the country, in collaboration with private law firms, *viz.:* "I mean I've been working with attorney general's offices across the country to kind of develop capacity in this area and it's something where you as voters and constituents can keep pushing forward. I also say that there's opportunity for collaboration across plain private law." *Taking Hate to Court circa. 53:03*

241.      There is a genuine dispute between VDARE and Defendants herein as to whether or not the First Amendment bars Defendants from regulating based on hostility or favoritism towards VDARE's speech.

242.      VDARE and Defendants are on opposite sides of this issue and thus have adverse legal interests: VDARE maintains that Defendants cannot target VDARE based on hostility towards the VDARE's message, while Defendant maintain that they can target VDARE so long as there is also at least probable cause to suspect some statutory violation.

243.      The facts and circumstances are sufficiently developed such that the issue is ripe for judicial determination; furthermore, clarifying VDARE's rights would undoubtedly contribute toward sparing others similarly situated from being burdened with the unlawful policy Defendant Sawyer boasted of spreading to other states attorneys general.

WHEREFORE VDARE respectfully requests a declaratory judgment stating that Defendants cannot target VDARE based on hostility towards the VDARE's message, regardless of whether or not there are statutory violations as described in the Civil Complaint in New York State court.

## COUNT SEVEN

### (INJUNCTIVE RELIEF AGAINT DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

244.     VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

245.     On September 3, 2025, Defendants James, Sheehan, Faux, Sterm, Sawyer, Finn and Liebowitz filed the Civil Case against VDARE.

246.     On November 5, 2025, in said Civil Case, VDARE filed a reservation of all rights pursuant to *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 421 (1964).

247.     Specifically, VDARE reserved the disposition of the entire case by the state courts and indicated that it intends to secure redress in the United States District Courts and to return to the United States District Courts for the disposition of Defendant's federal contentions that the state has unlawfully retaliated against it for protected speech under the First Amendment and has violated the Equal Protection clause of the Fourteenth Amendment and has violated its due process rights under the Fourteenth Amendment to exit the State of New York; and has interpreted New York state laws in contravention of the Supremacy Clause of the Constitution of the United States.

248.     Defendants intend to have VDARE  prosecuted on the retaliatory and selective charges of Civil Complaint referenced herein.

249.     VDARE requests a preliminary injunction barring the Defendants from any further prosecution of the Civil Case filed against it, until the constitutional defenses are finally adjudicated by this Court and in any subsequent appeal.

250.    As described in this pleading, any prosecution of VDARE based on the Civil Complaint violates the First Amendment and Equal Protection Clauses of the Fourteenth Amendment.

251.    For the reasons described in this pleading, VDARE demonstrates a high probability of success on the Civil Complaint.

252.    VDARE has suffered and will suffer irreparable injury for the deprivation of fundamental rights and will continue to suffer from being forced to defend itself against intentionally burdensome, retaliatory, and selective prosecution aimed at curtailing free speech rights, as described in this pleading.

253.    The balance of equities weighs decisively in VDARE's favor.

254.    The Defendants will suffer no harm from foregoing further attempts to prosecute VDARE unless and until it meet the constitutional challenge to their actions in this court.

255.    VDARE, by contrast, will suffer grave injury from Defendants' continued prosecution including the loss of timely commentary on issues of public importance, risks of lost income, loss of freedom of movement, continued deprivation of fundamental constitutional rights, and other harms; moreover, Plaintiff has taken the initiative to invoke the protection of the federal courts to vindicate their constitutional rights against lawless state actors.

256.    The public interest is manifestly served by granting the preliminary injunction against Defendants in their official capacities, in that Plaintiff, as any American citizen, is entitled to be free from the harassment and harm resulting from the maintenance and continuation of a prosecution that originated from wholly unconstitutional and therefore illegal government acts.

WHEREFORE, Plaintiff VDARE respectfully asks that Defendant be enjoined from further prosecution of the Civil Complaint, until a final adjudication takes place in this Court concerning the constitutionality of said acts, whereupon Defendants in their official capacity should be directed to dismiss said Civil Complaint with prejudice.

### DEMAND FOR JURY TRIAL

VDARE hereby demands a trial by jury on all issues so triable.

WHEREFORE VDARE respectfully requests judgment:

i. On the First Cause of Action, for compensatory and punitive damages in an amount to be determined at trial;

ii. On the Second Cause of Action, for compensatory and punitive damages, jointly and severally, in an amount to be determined at trial;

iii. On the Third Cause of Action, for compensatory and punitive damages in an amount to be determined at trial;

iv. On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined at trial;

v. On the Fifth Cause of Action, for compensatory and punitive damages in an amount to be determined at trial;

vi. On the Sixth Cause of Action, for a declaratory judgment stating that Defendants cannot target VDARE based on hostility towards the VDARE's message, regardless of whether or not there are statutory violations as described in the Civil Complaint in New York State court;

vii. On the Seventh Cause of Action, for an injunction from prohibiting further prosecution of the Civil Complaint, until a final adjudication takes place in

this Court concerning the constitutionality of said acts, whereupon Defendants in their official capacity should be directed to dismiss said Civil Complaint with prejudice;

viii. For the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

Dated: Goshen, New York
       November 24, 2025

Respectfully submitted,

/s/ Frederick C. Kelly
Frederick C. Kelly, Esq.
Attorney for Plaintiff
One Harriman Square
Goshen, NY 10924
(845) 294-7945

50